This is docket number 20-2215, Clean Air Council v. United States Steel. Mr. Schaffer. Good morning, your honors, and may it please the court. I'm Eric Schaffer, and I appear for the Clean Air Act Council in this case. I would like to reserve two minutes for rebuttal, giving me, I think, 13 minutes. I'll try to stick within that. I will stick within that time. With your permission, I'd like to briefly review some of the most important facts in our case, before highlighting some of the most important legal issues raised in our brief and in this case. So, beginning with what happened on Christmas Eve of 2018, a fire shut down, pollution controls at the Clareton Mill, the US Steel Mill in the Mon Valley, and that ended up causing the release of very large but unknown quantities of benzene, hydrogen, sulfide, and raw or untreated dirty coke oven gas through the flares that serve all three of those mills. These flares we maintain were not designed to handle dirty, untreated coal gas. That was the job of the units that had been destroyed or shut down after the fire. And these harmful emissions went on for four months until April of the following year, until pollution controls came back online. The impacts were serious enough to trigger health advisories that warned residents to stay indoors. Under CERPA 9603A, using the US code annotation, the companies must disclose the identity and estimated quantity of the dangerous toxins that are released during events like these to the National Response Center for every 24-hour period. Those emissions exceed reportable quantities. Coke oven gas is so toxic that any unpermitted release— Mr. Schaeffer, you've got a separate Clean Air Act suit against US Steel over these matters. Do the emissions of benzene, hydrogen, sulfide, and coke oven gas—you can break these apart if there's a different analysis of them—do they violate the Clean Air Act permits? Are they liable or in violation under those permits for those? So in our separate Clean Air Act case, we are alleging, for example, that the control units that were destroyed or closed were required to operate continuously. We raise issues about violation of the hydrogen sulfide limit that applies to these flares. Okay, so the hydrogen sulfide emissions violated the permits. Yes, that's a tougher issue. There is a sort of secondary question there. Those limits, we think, were designed to control sulfur dioxide, and there's an issue about whether they were designed to deal with raw coke oven gas, but we grant that that is a— You grant that hydrogen sulfide violates the limits. How about coke oven gas? Do the coke oven gas emissions violate? We do not allege the violation of any coke oven emission limits that apply to the flares, which is where these units were— Okay, you don't allege them in that case, but do you have any—did they violate it, in fact, with the coke oven gas? No, Your Honor. Our position is that they didn't violate emission limits. We're not untreated coke oven gas were violating of the flares. That is— I'm not asking whether you alleged it. I'm asking whether, in fact, they violated it. No, we do not think so. Okay, how about the benzene emissions? Same issue. Why didn't they violate those permits? I thought you have said that they were not permitted to release any benzene, for example. So this is an important question. We say they were not authorized to release benzene. That's another way of saying they weren't permitted to release benzene. To permit, to authorize, the same thing in the dictionary, New Oxford American Dictionary. Under the Clean Air Act, if you're not specifically authorized to release a pollutant, that does not mean you're prohibited from releasing it. It's not— So there is no Clean Air Act remedy. There's no reporting requirement that can release a lot of benzene, and the only way to get it is under CERCLA, not under the Clean Air Act, you're saying? That's our position, and that is right. And coke oven gas, too, both of these, they're not— because the permit says nothing, they're allowed to release unlimited amounts, whereas if it said one part per million, then it would be actionable under the CLEAR Act? That's very counterintuitive. Well, there are control— the assumption in this permit is that benzene and dirty coke oven gas would be cleaned up at the control unit, that one of them burned down and the other one had to be turned off. Those units are gone. They're no longer in play. Now those emissions are being routed, dumped, deflares at all three plants because those systems aren't operative. There aren't any limits or requirements that attach to the deflares. Okay, but coke oven gas results in the release of benzene and hydrogen sulfide, and you know, the L.A. and the county standards don't allow releasing unburned coke oven gas, so if that's so heavily regulated by the CLEAR Act, how is this not in violation of the permit? First, unburned coke oven gas, Your Honor, refers to leaks of coke oven gas that hasn't been treated from coke oven doors or from other process units. That's not what happened here. It does not refer to coke oven gas emissions after they've been routed through burners like deflares. Go ahead. So, you ask about whether CLEAR Act requirements apply that would require disclosure here. Our position is they do not. There is one requirement— Well, they do for hydrogen sulfide. We're talking now about reports. Okay. That are made within a 24-hour period every time you go to the threshold, and U.S. Steel has said, oh, in fact, they've said very clearly the CLEAR Act has identical requirements or the permit has conditions that impose identical requirements. You have to report emissions when they result from a breakdown of pollution control equipment. So, first, the breakdown occurred at Clairton. It didn't happen at the two downstream facilities. So, at best, it's just unclear whether they had any duty to report the emissions that were dumped onto their flares because Clairton couldn't handle it all. They sent it downstream to two other plants. There was no breakdown at those two other plants. Second, as we read it, the permit imposes a one-time requirement to dispose of identity, toxicity, and amount of the pollutants you're releasing, whereas you have to do that on a 24-hour basis until you get back—the pollution controls get back online. Also— Mr. Schaefer? Yes, sir. Could I ask you about your contention that subject to means in compliance with? First of all, we have a section here that has a number of subsections, 960110, and 960110H says subject to, but a number of the other subsections don't use subject to. They use in compliance with or identified in or something else. Don't we ordinarily treat Congress's choice to use different languages, different terms, as signifying some difference in meaning? Why shouldn't we apply that canon here? So, Your Honor, obviously that's a key question. I'd like to address that and then get to what it can't mean if you look at the rest of the words in the statute, because I think that's really important. Okay, but let's start with the specific phrase subject to. I want to talk about 9601, and then I'll move to a couple of other surplus sections. The dictionary says that are cited, it can mean governed by, affected by, or obedient to. All right, dictionaries outside of context. Now, let's talk about what this context tells us. Right. The district court's opinion, I just want to point out, says it can't mean that sources must comply with Clean Air Act permits, but they must simultaneously abide by the requirements in those permits. So, that doesn't sound like a very clear explanation of a term that is supposedly clear on its face. We think Congress did try to explain in legislative history what that term meant, we think. We think Congress wrote that language to try to reflect, and I'm talking now about the Senate committee report, and I realize the court didn't reach that. I understand, you know. I'd like to talk about the text before we get to legislative history. How do we understand why H uses the phrase subject to when the surrounding subsections use other phrases, like in compliance with? We understand, Your Honor, that that's a troubling discrepancy, so we can see that. We are trying to suggest that because the definition of subject to is so modeled itself, that it's possible it meant something else. So, perhaps something between, on the one hand, if you have a limit, you don't have to comply with it no matter how bad, and no, you have to comply with it. It's possible there's some, you know, some room between those two terms, but, you know, we can see that's a significant issue. All right. So, let me go to some other sections of CERCLA that I found that use subject to, and we're allowed to look to surrounding sections to see, not just in the abstract, the dictionary meanings, but which of those meanings Congress picked here. So, 9620A1 says each department, agency, and instrumentality of the U.S. shall be subject to, comma, and comply with, comma, this chapter. So, unless it is completely redundant, subject to does not mean comply with there. I understand, Your Honor. It, you know, it is, it's difficult to wrestle that into place. I would, I would say that it would be fair to look at whether that results in a result that would seem absurd, as in a very, suppose you had a very, very, you had a terrible release that, you know, killed people living next to the plant, and you could point to a requirement, obviously not met, and say, see, I was subject to that, and so, therefore, I didn't have to We don't think there are parallel Clean Air Act requirements that require that kind of prompt disclosure, especially on an ongoing basis. Let's go to Circle 9604K9. Each grant or loan made under this section shall include a requirement, but, and also be, be subject to an agreement that, one, requires the recipient to, I, comply with all applicable federal and state laws. Why are they using subject to, and then comply, as spelled out as a distinct requirement? So, the court, this court, has observed that this is a poorly drafted statute with lots of terms that conflict. You know, I can't, I acknowledge that I can't fully explain why the Congress used different terms, but I really would like to get to the next question, which is, subject to what? What do you have to be subject to? If I may, I'd like to work through those issues. Please. And I'd like to talk about what it can't mean in the context of the statute, which I don't think the court reached, the district court reached. First, it just can't mean that this exemption applies to any emissions from a facility just because it has a permit. All right, let's, let's grant you the district court opinion was not precise in distinguishing regulation at the level of the emission from regulation at the level of the facility. Respectfully, Your Honor, I think it actually was precise in saying, if you have a permit, you are exempt by virtue of having a Title V permit. So, it did say that specifically, and that just can't be when the text at 10110H says it has to apply, the exemption has to apply to the specific release of any hazardous substance that is subject to a permit or control regulation. And I'd like to get to what that means next. Second, we don't think it can possibly mean that any pollutant that could be regulated under the Clean Air Act, but actually isn't, because there aren't any applicable regulations to bring it under the umbrella of the Clean Air Act and make it actually subject to any permit or control regulations. That can't be enough to qualify for the exemption. You know, I just want to point out that Circlin 9601-14E makes clear that hazardous substances include hazardous air pollutants listed under Section 112-7412 of the Clean Air Act. That's part of the statute that governs hazardous air pollutants. So, it can't simultaneously be exempt from CERPA for the very same reason, which would be, well, it's subject to Section 112 of the Clean Air Act. You can't just point to statutory provisions. All right, Mr. Schaefer, I'll ask you a question, and I think I'll ask Mr. Martin this question, too. Can you explain to me how the CERCLA enforcement provisions interact with the Clean Air Act SIPs and enforcement provisions? I'm trying to understand, let's say that we reported via the Clean Air Act, and feel free to dispute that or explain why that's not right, but if they are in fact reported, will that then be referred over? Is there communication between the two reporting systems such that it'll be flagged one way or another, or is there a reason to have some redundancy between the two systems of reporting? Let me first say that if these emissions of these particular substances had been reported by U.S. Steel under the Clean Air Act or any other law of the land, we would not be here. We would not be here. So, we do not think there are parallel Clean Air Act reporting requirements. There are lots of reporting requirements in the Clean Air Act. Are they set up to alert response authorities and the public when the releases may constitute an emergency? There's just nothing that is parallel to that, and 7412R of the Clean Air Act doesn't cut it. It doesn't apply on its face to coke, oven gas, and benzene. The reporting requirements are different. In that statute, 7412, the reports go to the Chemical Safety Board, and they're about advising the Safety Board that something's happened. If they want to do a follow-up investigation, they have that report. The statute says rely on CERCLA to satisfy those 112R reporting requirements. It doesn't say that's the only way to comply, but it says a CERCLA report will satisfy the reporting requirements of the statute. So, that certainly suggests why would you do that if there already were parallel Clean Air Act reporting requirements, and why would you have to set up a reporting system for accidents in the first place under the Clean Air Act, and why would you rely on those reports when doing so? We also want to point out whatever the reporting requirements are under 112R, they didn't apply in this case. Believe it or not, the rule establishing those requirements didn't take effect until 20 years after, no, I'm sorry, 30 years after the 1990 Clean Air Act authorized that reporting. It didn't take effect until last year. I just want to point out the district court just didn't identify any specific perimeter control requirements that apply in our case. This is not a term, permitting control regulation, that you can easily define by looking at the dictionary or wading through the rest of the statute and trying to distinguish it from other terms. It's a term of art. Mr. Schaffer, should the district court at the 12B6 level taken an analysis or done analysis as to the scope of the plant's permits? Absolutely. The district court has to determine whether any requirement or control regulation that's meant to control the pollutant that's been released exists in the first place. Under the permits, right? For each of the substances at issue. Did the district court do any sort of analysis? Nothing on the face of the opinion. We don't really see anything in U.S. Steel's brief either. They say we have a permit and it's got a whole bunch of control requirements. The answer is somewhere here in the Clean Air Act bushes, but they don't say where we can find it. That's really important because you've got to have a limited control regulation that applies to that particular release. With the legislative history, I'm talking about the Senate report providing a clear explanation of what we think is a term of art. That further says that permanent control regulation has to be specifically designed to control the release of the hazardous pollutant in question. You can't just toss up a word salad of Clean Air Act requirements and just try to create a blur and use that to argue that you're subject to your federally permitted release because you're subject to the Clean Air Act. I really think underneath this, both the court and U.S. Steel are arguing that because you could be regulated under the Clean Air Act, you have a federally permitted release. Again, I would just point out if Congress meant to exempt air pollutants, virtually all of which are covered or could be under the Clean Air Act, why didn't they do it? They just didn't do it in this particular provision at 10110H. In general, we think the problem with the court's opinion is it read two words in isolation, subject to. It missed that it's got to apply to release. It didn't define what permanent control regulation means. It didn't, looking at that term of art, try to explain what the term meant. It should have consulted the very specific definition, which U.S. Steel also refers to, to define that term. It would have been very helpful in that case. That's generally what courts do when statutory words aren't really clear on their face. Stating the obvious and why we're here, we don't think the court had real grounds for granting a 12v6 motion. There are too many unanswered questions. I know that U.S. Steel tries to argue that we've admitted that these are all federally permitted releases, but the parties here are proceeding under very different theories, arguments, legal arguments about what a federally permitted release is. For example, U.S. Steel says, oh, if you're subject to a Title V permit, well, that doesn't mean anything without further inquiry. Have we said emissions are governed by, that they are subject to a Title V permit? Yes, we've said that. That doesn't mean, under our theory of the case, that they're subject to permanent control regulations meant to control the hazardous pollutant that's been released. The court really didn't reach that issue. If I may, I just close by saying, if the emissions of dirty coke, open gas, and the other toxins released here, under the circumstances of our case, aren't required to promptly disclose and repeatedly disclose to the National Response Center how much these toxins are released, then no one is. There are no emissions covered. I don't think the court worked through that outcome. There's a waving around of statutory provisions of 112R, which we argue don't apply, and the court didn't show they apply. All right. I think we follow your argument, Mr. Schaffer. We'll have you back up here and rebuttal soon. Thank you. Thank you, Your Honor. Mr. Martin. Good morning, Your Honors. May it please the court, James Martin for U.S. Steel. The analysis here, Your Honors, does not start with the record. It doesn't start with the permits. It starts with the statute. And plaintiff's arguments, whether in their brief or here today, boil down very simply to an attempt to redraft and change what Congress has enacted. And as district court found, that's not a role for a court. Now, U.S. Steel did not report the emissions here under CERCLA because it was not required to as a matter of law. The relevant CERCLA reporting exemption, section 961010H, applies first to any emissions into the air that are second subject to a list of Clean Air Act permits and regulations under state implementation plans and made applicable by Title V operating permits. So the permits and regulations referenced in subsection 10H are the ones regulating U.S. Steel's facilities, the processes, and emissions. Should the district court, so should the district court have undertaken a robust analysis of the permits? The answer to that firmly and unequivocally, Your Honor, is no, based on the plain statutory language in the subsection that applies. Now, why is that the case? Because subject to means affected by the permits. And plainly, they are affected by the permits here. As the Clean Air Act action filed by the plaintiffs reflects, as the ACHD's enforcement action reflects, as the notice of intent to sue filed in this case reflects, and finally, as the specific allegations in the respective complaints reflect. The statute doesn't say we have to have leases of specific limits in specific permits. It doesn't say in compliance with. So that means if I take it to its logical conclusion, once you have a permit, you can do whatever you like. Is that your position? No, absolutely not, Your Honor. Let's understand what's going on in this case. Because we have a Clean Air Act permit, and because these emissions are subject to the local requirements and regulations requiring monitoring and reporting, we are being regulated. There's an enforcement action against us right now. Beyond that, we are in a Clean Air Act lawsuit seeking civil penalties for purported violations of the Clean Air Act, emphasizing again that the additional report under CERCLA, something that the statutory scheme not only does not require, but back to Judge Bibas's question, it would be inconsistent with the statutory scheme to require it. Could you talk about that issue of reporting requirements? How do the CERCLA and Clean Air Act reporting requirements interact? Is there a way in which the redundancy would be helpful if these emissions, because I think you're taking the position that you didn't report these releases after the fire. So is your position in that suit and this suit, they don't need to be reported under either scheme? I mean, I think there's a worry that some of these will fall through the cracks. Let me start with the second half of that question. Did they have to be reported under the Clean Air Act and under our permits and the local regulations under the Clean Air Act? The answer to that is yes. Now, and I'm going to finish this with the second part of it. When you're under a Title V operating permit subject to local regulations, which we are, that fully incorporates every provision of the Clean Air Act and every ambient air standard in it. And under the Clean Air Act, all the emissions that are part of this lawsuit are regulated either expressly or by direct implication through the state SIP. And so there is no debate here that these emissions into the air from the facilities being operated subject to these permits with processes that were subject to the permits had to be reported under the Clean Air Act. There's no gap there. And then the enforcement action that follows and the plaintiff's complaint in the Clean Air Act case, which applies to the facilities, the emissions, demonstrates that. Now, turning to CERCLA, if we had a burst pipe here that was not a part, perhaps, of these processes that are expressly regulated, maybe there would be a report under CERCLA due. But as to the emissions that are Clean Air Act regulated, Judge Bibas, it's not about compatibility or convenience. That would be modifying the language of the statute. The express directive and the exclusive directive is to report under the Clean Air Act and to be exempt from CERCLA. So it's not in the conversation. Now, why would Congress have taken that view? It's been described as illogical here this morning, but it makes good sense. The Clean Air Act regulates emissions, it regulates pollutants, it regulates the sources of emissions. It does so through a very elaborate statutory structure. The CERCLA is not structured like that. It has no specific reporting requirements, and it would bring 1,000 additional chemicals into the calculus here. On the front end, the regulatory burden of trying to comply with CERCLA would be insurmountable, difficult, or problematic for all three, which leads us to why Congress would have separated these two reporting schemes where the Clean Air Act is in play. And so there isn't any issue about that would be an effort to modify the statute, a role that the court doesn't have. And on its face, the way the statute works, you want the separation in this particular instance where the operating permits cover the chemicals. Now, there seems to be... Let me ask you a hypothetical. Some bleach is brought into one of the plants in response to a COVID issue. The chlorine mixes with some of the chemicals, causes an explosion, all sorts emissions are released. Would that be covered by the permits or is that a CERCLA issue? So if the permitted processes involve the chlorine there, which it sounds like they do, that would be involved with the permits and you'd be covered under the Clean Air Act. And if it wasn't? If it wasn't, there could be a CERCLA report. As I said, there might be a way from these in it. But here, let me reinforce just how linked the Clean Air Act is to this lawsuit by what's going on. Let's start with what the record shows. So the plaintiff concedes and conceded here this morning that the Clean Air Act lawsuit and the CERCLA lawsuit cover the same coke oven combustion process, the same releases, and the same permitted source facilities. So Judge Restrepo, to your question, in this case we're squarely within what the permits are about. Second, plaintiff's CERCLA complaints, look at JA 20 to 24, contains express allegations that the challenged emissions of coke oven gas, benzene, and hydrogen sulfide triggered ACHD's enforcement action and also alleges that these emissions violated EPA emission standards. Well, where do those come from? They come in through the Clean Air Act, which is expressly incorporated into the permit. Let's look at the exhibits attached to the complaint. Again, focusing on this specific case, the notice of intent to sue draws expressly on the Title V permits, makes reference to hydrogen sulfide, benzene, and coke oven emissions at the facilities, and says that the permits are being violated, JA 32 to 45. The ACHD's enforcement order also specifies the releases of coke oven emissions and benzene as the reason for invoking the regulatory authority, in this case under the Title V permits, under Article 21 and the Clean Air Act complaint. It says the emissions from the failure to properly operate the pollution control equipment violated the Title V permit. Again, we're not speculating here. The state SIP, the ACHD regulations, and the standard set by Article 21, all of which is incorporated into this reporting exemption. Count one of the complaint applies to the equipment. Count two of the complaint to air pollution, in general. If more were needed, in opposition to the motion to dismiss, the plaintiff stated that the air emissions that follow the equipment breakdown were not controlled as required by the permits or control regulations, and therefore the releases of benzene, hydrogen sulfide, and coke oven emissions violated the Title V permit. Now, even without all of this, as I mentioned earlier, the Clean Air Act would be in play here. Two of the three substances alleged to have been released, benzene and coke oven emissions, are specifically designated as hazardous air pollutants under the Clean Air Act, meaning by the force of the express language of the statute, the SIP, and these permits, they are regulated here. Beyond that, hydrogen sulfide, as council conceded, is mentioned in the Clean Air Act complaint, and the complaint says, in fact, that it's directly regulated. So what we end up with is a case in which the permits are squarely applicable and we fit all pieces of the definition. That leads us to the question about whether this was properly resolved on a motion to dismiss. Well, the complaint, by its terms, brings the exemption into play. In three places in the complaint, JA20, JA25, and JA28, there is express reference to the exemption that we are talking about. This court has said on multiple occasions that when a complaint brings an affirmative defense in play, it's in play on a motion to dismiss. Second, everything that is needed to create the application of the exemption is in the record on the motion to dismiss, and that is the notice of intent to sue, the respective complaints, the ACHD enforcement regulation. All of that is brought to bear. And so what we have is a circumstance where the district court correctly recognized that all the open questions in this case, or what could have been the open questions, were answered by the record that was provided. Getting back to the legal question, are we talking here about any emissions into the air? Yes, we are. Are we talking about any emissions into the air that are subject to the Title V permits and the local regulations? And the answer is, yes, we are. We know that as a matter of a law and fact. Now, lastly, plaintiff's proposed construction here that reaches to legislative history violates the toolkit of statutory construction principles that this court should be applying and certainly can't overcome the presumption in favor of the construction that we have offered. Under plaintiff's analysis, any emissions becomes emissions of specific chemicals that are within specific limits. Subject to becomes in compliance with the permits and specifically mentioned in that. None of that is in the statute. And if you look at the remaining provisions of this exceptions, when Congress intended that result, it's in there. It's not in the one that regulates air emissions subject to the Clean Air Act because Congress didn't intend that. The contrary construction, Your Honors, is a bridge too far and it should be rejected by this court. Does the substance have to be identified or mentioned in the permit in order to be subject to it? No, Your Honor, it does not. First of all, that's, well, to be subject to the permit means affected by or governed by. And so the emissions have to be subject to, at the end of the day, the Title V permit or the local control regulations. And as I walked through before, these emissions plainly are. The record tells us that. You do not need to look any farther than that. Importantly, the emissions into the air in this exception are without limitation. It doesn't relate to the amount of chemical release, why it was released, whether it's specifically mentioned in the permit or not. The same is true of the second half. All we have to do is have emissions governed by permits. And it doesn't say they have to be in in the permit. Rather, the question is, are they subject to it? And here again, by virtue of the provisions of the Clean Air Act, the state SIPs, the local regulations, and Article 21, they are subject to. That's why the ACHD filed an enforcement action. That's why they joined the Clean Air Act complaint. It's the same processes. It's the same emissions. It's the same place. And that's dispositive for the court's analysis. Judge, unless there are further questions, I think I'm over my time, Your Honor. Thank you very much, Mr. Morton. Thank you, Mr. Shaver. You're muted, sir. My apologies. I wish I had more than two minutes, but very quickly. I heard Judge Restrepo ask, did the court look into the permit and control regulations that apply to these releases? I didn't hear an answer. The question is, what permit and control regulations apply to the emissions of benzene and coke oven gas, at least, at the flares which released this dirty coke oven gas? I didn't hear Mr. Morton answer that either. Invoking a long list of Clean Air Act requirements doesn't answer that question. The issue is, which requirements apply under the circumstances of this case to the releases from the flares? We don't think that was looked into. We don't think the case can be resolved without it. And we don't suggest you decide that on summary judgment, or rather on a motion to dismiss. I think U.S. Steel talks about the Clean Air Act reporting requirements. I just want to say again, it has not reported these releases under any statute. It has not done that. It says it did report under the particular Clean Air Act requirement that applied to running on a theory that if you have the Clean Air Act, it must mean under the language of 101 10H that emissions are exempted. Congress could have said that. I would add that Congress has had many opportunities, including when it enacted the 1990 Clean Air Act, to say that they displaced the reporting requirements of CERCLA. It didn't do that. There's a lot of speculation about what the district court did and what Mr. Martin is doing, is relying on the 1990 Clean Air Act, which is the part that established Title V, to show what Congress meant when it wrote CERCLA in 1980. I'm not sure what principle of statutory construction allows you to time travel to figure out what Congress meant 10 years before the second law was enacted, or why that law didn't just forthrightly knock out CERCLA reporting of air emissions. In fact, as you can see from the 112R language, it looks very much like Congress assumed this would continue because it directed the board to rely on those reports. By the way, that's what every industry group asked the board to do. Mr. Schaffer, you're correct that we ordinarily do not rule on affirmative defenses, if we assume this is an affirmative defense on a motion to dismiss. On the other hand, we do have this exception when a party either attaches a document to the complaint or the complaint necessarily references a document. If you've admitted, either in that attachment or in this argument, that at least hydrogen sulfide was a violation of the Clean Air Act, why isn't that something that we can consider it a motion to dismiss on an affirmative defense? I'll grant the hydrogen sulfide case. That one is a little different, and there's an issue there, for sure. Our reaction is that limit applied not when dirty coke oven gas was being burned in flares. It was meant to apply when the pollution control units upstream were working. But there's nothing as a matter of law that precludes us from considering that at a motion to dismiss. I might argue that it would be better doing that with some more facts, but I don't want to stubbornly insist on that point. But I would say, if you do reach that issue, the question is, what about benzene? And what about dirty coke oven gas that's being burned in those flares? Where are the requirements? And in particular, how would that fall? In what way does whatever applies fall under the definition that's in the legislative history, which says it's got to be designed to reduce that specific pollutant? I don't agree that you can't reach the legislative history. I respectfully suggest you have to, unless everyone knows what permit and control regulation means. And you can see from this case, I think that we don't agree. I maybe should just close by saying we worry that if this decision is adopted or upheld, at least in the Third Circuit, we don't think these circular requirements would apply at all. They are designed to alert response authorities and the public in case of emergencies. And by the way, we hear cooperative federalism a lot. You don't know who's going to respond to an emergency. It could be the feds. That happens sometimes. So what this report does is make available that information, specific information, so that whoever is responding to the event can react appropriately. We think, especially in a 12 v. 6 motion, we don't think it's appropriate to upend an interpretation that in practical terms, companies have been living with for 40 years. And we would just close by respectfully asking that you give the Clean Air Council its day in court. Thank you for your time. Thank you, Mr. Schaffer. And before we sign off, gentlemen, it'd be greatly appreciated if you folks could contact the clerk's office and make arrangements to have a transcript of this argument documented, and we'll ask that you split the costs. Thank you, Your Honor. We'll do so. We will do that, Your Honor. Great. Thank you, gentlemen. Thanks for your briefs. Thanks for your arguments. Have a great rest of your day.